*49 OPINION OF THE COURT
Joseph Harris, J.
This is an application for an order and judgment, pursuant to CPLR article 78, reversing a determination by the respondent Public Service Commission (hereinafter alternatively referred to as PSC), authorizing and permitting respondent, Consolidated Edison Company of New York, Inc. (hereinafter alternatively referred to as Con Edison or the Utility), to bill petitioner for alleged unmetered electric service.
The relevant facts are as follows: On May 20, 1980, petitioner established an electric account with Con Edison for a grocery store. Based on a "load factor study”,[1] indicating to the Utility that petitioner’s load factor was extremely low, the Utility, on January 24, 1985, conducted an unscheduled inspection of petitioner’s electric meter and found there was no seal on the meter cover, that the seal on the terminal chamber had been cut, giving access to the dials therein, and that the seal wire had been reinserted to make it appear intact.
-As a result of the inspection, Con Edison accused petitioner of theft of services and submitted to him a bill representing unmetered service.[2]
Petitioner requested an "informal hearing” before the Public Service Department, which hearing was held on February 13, 1986. The Hearing Officer held that although the evidence showed that the meter’s seals had been tampered with, Con Edison had not met its burden of showing that the meter recorded less than 100% of the connected load. The Hearing Officer noted that the meter had not been tested and was no longer available for examination. She agreed there was during the disputed period a gradual and dramatic drop in energy *50 consumption without a corresponding drop in demand, resulting in a load factor that was “incredibly low for the nature of [petitioner’s] business”, that this was "surely suspect” and warranted an investigation of the account. She concluded, however, that these statistics by themselves did not constitute sufficient proof of unmetered service; that without a report of the physical condition of the meter, a meter test and the availability of the meter for inspection, or other clear-cut evidence, the Utility could not sustain a claim for unmetered service.
*49 Average load factor =
Kilowatt hours in the billing period Average maximum kilowatt demand X number of hours in period.
*50 The Utility appealed to the Public Service Commission, contending that the decision of the informal Hearing Officer was based upon irrelevant considerations. In response to the Hearing Officer’s finding that the Utility “provided no evidence that the meter recorded less than 100% of the connected load”, Con Edison asserted there was no need for such evidence inasmuch as it did not contend that the meter recorded less than 100% of the actual energy and demand usage. Its position was that the customer, having cut the seals, giving him access to the energy dials within the meter, had affected the consumption readings by turning back the dial hands — a more sophisticated means of theft than merely bypassing the meter — so that figures lower than actual consumption were read by the meter reader on the cycle reading dates.
The Public Service Commission reversed the Hearing Officer’s decision, holding that while load factor analysis by itself would not be sufficient to sustain a claim of unmetered service, in the instant case, where the claim is manipulation of the meter dials to read less than actual usage, rather than physical interference leading to a bypassing or nonfunctioning of the meter, the Utility’s report documenting the condition of the meter — namely, removal of the seal on the meter cover, the cut seal on the terminal chamber, giving access to the meter dials, and the reinsertion of the seal wire to cloak the fact that the meter was not intact — together with the load factor analysis of petitioner’s billing history, were sufficient evidence of underbilling during the disputed period.[3]
*51 The standard of judicial review herein is whether the determination of the Public Service Commission is arbitrary and capricious, without a rational basis, not whether it is supported by substantial evidence. The latter standard applies only to determinations by administrative agencies made as a result of a hearing held "pursuant to direction by law” and at which evidence was taken (CPLR 7803 [4]; Matter of City of Rome v New York State Health Dept., 65 AD2d 220, lv denied 46 NY2d 713).
The phrase "pursuant to direction by law”, as set forth in CPLR 7803 (4), has been interpreted by the courts to mean a hearing "mandated” by law. (Matter of Colton v Berman, 21 NY2d 322; Matter of City of Rome v New York State Health Dept., supra.) Absent such a mandated hearing, the standard of judicial review is the rational basis, or arbitrary and capricious test set forth in CPLR 7803 (3), even where an evidentiary hearing not mandated by law is in fact held in the agency’s discretion or pursuant to the agency’s own bylaws. (See, Matter of City of Rome v New York State Health Dept., supra.) Such is the case in the matter before us here, and thus the standard to be utilized here is whether or not the determination of the Public Service Commission was arbitrary and capricious, without a rational basis.[4]
A rational basis is readily made out upon the following evidence: that the seals on the meter cover and on the terminal chamber had been cut, giving ready access to the energy dial hands; that the seal wires were reinserted to make the meter appear intact; that the unscheduled meter inspection of January 24, 1985 showed that since the scheduled meter reading of January 18, 1985, petitioner used 1,620 kwh —a rate of usage several times higher than the normally *52 billed usage during the disputed period; that load factor analysis of the petitioner’s billing history showed a steep drop on energy consumption during the disputed period, resulting in a load factor not only far below the petitioner’s usage both before and after the disputed period, but also contrary to what would be expected, given the nature of a grocery business.®
All of the above is good and sufficient circumstantial evidence supporting the rationality of the Commission’s decision. It is not for the court to superimpose its "wisdom” upon the judgment of an administrative agency. Administrative agencies are endowed by experience with greater expertise than the usually generalized court, and where agency determinations cannot be said to be arbitrary and capricious, they cannot be disturbed. (See, Matter of Pell v Board of Educ., 34 NY2d 222; Matter of United States Tube & Foundry Co. v Feinberg, 7 AD2d 591; Matter of Consumer Protection Bd. v Public Serv. Commn., 110 Misc 2d 1.) Such is the case here.
All questions pertaining to calculation of the underbilling were handled appropriately by the Commission.[5]
[6] (See, Matter of Capital Props. Co. v Public Serv. Commn., 91 AD2d 726; S & D Thrift Stores v Con Edison, 80 AD2d 581; Public Service Law § 66 [12].)
Let judgment be entered dismissing the article 78 proceeding herein and confirming the determinations of the Public Service Commission in all respects.

. A commercial customer such as petitioner is charged on the basis of two measurements, the total amount of energy consumed and a demand charge — that is, the maximum level of energy consumed at any given time. The demand charge reflects the fact that generation facilities must be built to meet the peak electric demands of utilities’ customers. Load factor represents the relationship of the customer’s total energy consumption in kilowatt hours to the measure of peak demand during the billing period.

. The bill submitted was $14,896.98, with an additional late payment charge of $5,442.93. Upon petitioner’s complaint to the Department of Public Service, these amounts were adjusted and reduced to $13,152.70 and $3,700.70, respectively.

. The Commission noted that prior to the disputed period (May 20,1980 to Nov. 10, 1981), the petitioner’s load factor was 47.7% with an average energy use of 77.8 kwh per day and a demand of 6.8 kw. During the disputed period (Nov. 10, 1981 to Jan. 24, 1985), the load factor dropped to 19.3%, with average daily energy use of 45.4 kwh and an average demand of *51 9.8 kw. After the disputed period, and the replacement of new metering equipment (Jan. 24, 1985 to Feb. 20, 1987), the load factor rose to 43.2%, with average energy use of 45.6 kwh and an average demand of 4.4 kw. (The Commission noted that after new metering equipment was installed, petitioner had the opportunity to lower his recorded demand by reducing his usage.) Most importantly, the Commission noted that between January 18, 1985, a routine meter reading date, and the unscheduled reading date of January 24, 1985, done as a result of the Utility’s load factor analysis — a reading that could not have been anticipated by the petitioner — the petitioner had used 1,620 kwh, representing a rate of usage several times higher than actual billed usage over the past several years.

. Even if the substantial evidence rule were to apply, the court, upon the record evidence, would find that the Commission’s determination was supported by substantial evidence.

. Load factor measures the percentage of time a customer operates at peak demand. A grocery business, operating refrigeration equipment, generally requires electrical service with a load factor of 50% or more.

. The Commission directed Con Edison to reduce its bill for unmetered service by basing its estimates of past usage on a load factor of 47.7% rather than 71.8% to reflect more closely the load factor before the disputed period. Where the evidence shows that a meter was tampered with, the question of who did the tampering is a nonissue. The only issue is whether or not the customer received unbilled service. If he did, he must pay for it. (See, Public Service Law § 65 [2]; Matter of Capital Props. Co. v Public Serv. Commn., 91 AD2d 726.)