OPINION OF THE COURT
Henry F. Zwack, J.
In these three CPLR article 78 proceedings,[1] petitioners seek review and vacatur of the order resetting retail energy markets and establishing further process (reset order) dated February 23, 2016. The petitions also seek a preliminary injunction, staying the effective date of provisions 1 through 3 of the reset order, which was March 4, 2015. A temporary restraining order was issued by this court (O’Connor, J.) on March 8, 2016, staying implementation of the reset order until further order of this court. Respondent has moved for an undertaking in connection with the stay, which is opposed by all petitioners. Leave to file briefs and participate in oral argument as amici curiae were filed by the Public Utility Law Project (PULP), New York State Attorney General’s Utility Intervention Unit, American Association of Retired Persons, and MFY Legal Services. Oral argument was requested by all petitioners, but after a careful review of the petitions, affidavits, and documentation submitted, as well as the administrative record, the court has determined the same to be unnecessary.[2] The court also notes that petitioners have filed for a rehearing on the reset order.[3]
The reset order involves a change in the way energy service companies must deal with their retail and mass market customers. Among the new requirements:
“Effective ten calendar days from the date of issuance of this order, energy service companies (ESCOs) may only enroll mass market customers and renew expiring agreements with existing mass market customers based upon contracts that guarantee savings in comparison to what customer would have paid as a full service utility customer *644 or provide at least 30% renewable electricity.”[4]
To understand the scope of the reset order, the order explicitly directs “that the transformation of the retail energy markets commence immediately.” The petitioners argue that the failure of the respondent to give any notice of the sweeping changes to the energy retailers who represent over 200 million electric and natural gas customers (or 20% of the energy market), the failure to solicit their input, and the failures of the order itself to describe how implementation, compliance and administration with the order are to be handled, and which will cause irreparable harm to the retail energy market, warrant the vacatur of the order. Illustrative of the deficiencies with the reset order, respondent issued three guidance documents before the implementation of the order, announced that comments regarding the reset order could be submitted within 60 days from its issuance, and held a “discussion” about compliance on February 29, 2016. Although the reset order allowed companies to request extensions of time to implement the order, none of the requests were granted. Petitioners specifically argue that the reset order lacks a rational basis, is not supported by substantial evidence, is arbitrary and capricious in that no notice of the same was given, and constitutes a regulatory taking without just compensation in violation of the 5th Amendment of the United States Constitution and article I, § 7 of the New York State Constitution. Petitioners allege violations of the 14th Amendment of the US Constitution and article I, § 7 of the State Constitution. Petitioners further argue that respondent has no authority for its actions, as it cannot set rates for energy service companies, and this action is therefore ultra vires, an act beyond which it has been granted authority by the legislature. Further, in issuing the order without notice, the respondent has violated the State Administrative Procedure Act.
National Energy Marketers Association (NEMA) alleges that the reset order violates the State’s Environmental Quality *645 Review Act, which provides that any agency’s administrative action which “may” have environmental impacts must comply with the statute. Among the justifications for this argument, NEMA notes that many ESCOs are purchasers of renewable energy, and that the market will be affected if these ESCOs are put out of business. These petitioners also seek expedited discovery in order to support the claims that the order is arbitrary, capricious, not supported by the evidence, and “designed to favor utility companies or other preferred constituents to the detriment of Petitioners and others similarly situated.”
The Retail Energy Supply Association asserts that the Public Service Law does apply to ESCOs, and rather, these retail energy “companies” (not corporations) voluntarily cooperate with the Public Service Commission (PSC) and Public Service Law, and entered into the Uniform Business Practices (UBP) to standardize key procedures between the “monopoly” providers and the ESCOs, or “utility parties” and “non-utility parties” — arguing ESCOs are therefore exempt from Public Service Law article 4, which regulates utility rates.
Family Energy Inc. argues that ESCOs exist by virtue of their “licensing” by the PSC, and as such, strict application of the notice and comment requirements of the State Administrative Procedure Act must be followed, which was not done when the reset order was made.
In support of their request for a preliminary injunction and vacatur of the order, all petitioners point to the total lack of guidance they have been given as to how to implement these sweeping changes, and cite to the loss of customers and customer confidence they will suffer as they struggle to comply with the reset order — which provides no direction as to how they are to meet the administrative challenges of implementation and compliance. For example, they argue ESCOs were given no guidance as to how to charge the same or less than the public utility prices, particularly as they have no way of knowing what those prices are, and that question remains unanswered. With all requests for additional time having been denied, petitioners have no further recourse but to seek this injunction.
For its part, the PSC has filed a verified answer and raised several objections in point of the law. The first objection is this is not a hybrid action, but an article 78, and should be converted to that; petitioners have failed to exhaust administra *646 tive remedies; and petitioners have failed to establish that the reset order is arbitrary, capricious, an abuse of discretion, or affected by error of law.
Respondent argues that ESCOs have no vested property rights in access to utility systems arising from the Commission’s exercise of discretion to create a competitive market, particularly when customers are overcharged due to the unworkability of the market. This is not a rate setting order, according to respondent. Respondent argues that it has exercised its article 4 jurisdiction with respect to public utilities to determine what prospective contract offerings ESCOs have to offer in order to retain access to utility distribution systems. Respondent argues that it has authority to control access to public utility pipes and wires in order to maintain a competitive ESCO marketplace.
Respondent also argues that petitioners did not exhaust their administrative remedies with respect to that portion of its February 2014 order which concluded that the market was not workably competitive and mass market consumers were not generally being offered energy-related value-added services or savings. Respondent argues that because it was not raised before the Commission in any of the petitions for a rehearing, petitioners may not raise it in this proceeding.[5] Respondent points out, as evidence of the unworkability of the market, that ESCOs cannot beat the price of the monopoly provider, even though they receives tax benefits (Tax Law § 1105-C). Respondent asserts ESCOs are charging higher prices while offering non-energy services of a very low value, like rewards programs (gift cards) rather than “innovative services of value to consumers.”
In reply, petitioners challenge the Commission’s assumptions that the retail market is not competitive, and that consumer complaints have increased when in fact consumer complaints have declined regarding products they are buying.
A bit of discussion on the genesis of the retail energy market is in order. In 1996, the PSC began unbundling electric rates in distribution and commodity components in order to permit electric competition[6] with the goal of lower utility bills and introduction of innovative products and services through retail *647 competition and increased consumer choices (1998 NY PSC Op No. 96-12). In 2002, the PSC adopted the UBP as a unified set of rules governing retail access (ESCO) programs to the various utilities. In 2002, the legislature amended the Tax Law to create a utility delivery tax break for ESCO customers, with any tax on delivery to be phased out by 2003. In 2002, the legislature amended Public Service Law article 2 to provide that the Home Energy Fair Practices Act (HEFPA) applied to the retail energy market, and given compliance with the consumer protections of the act, ESCO could now terminate service to compel payment.
Following several related PSC staff investigations, respondent proposed that the retail energy market was not workably competitive for residential and small commercial customers. The Commission then ordered numerous modifications to the UBP and to utility tariffs (Proceeding on Motion of the Commn. to Assess Certain Aspects of the Residential and Small Nonresidential Retail Energy Mkts. in N.Y. State, NY PSC Case No. 12-M-0476 [Feb. 25, 2014]). Among those orders was the directive that ESCOs serving low income assistance program utility customers (also assistance program participants, or APPs) must either guarantee savings over what consumers would pay their utility or provide such consumers with energy-related value-added services that reduce the consumer’s overall energy bill.[7] Following numerous petitions for a rehearing, the PSC stayed enforcement of the February 25, 2014 mandates.
The February 25, 2014 order was affirmed by order dated February 26, 2015, and ESCOs who serve a participant in a low income assistance program are required to guarantee that a person will pay no more than what he or she would pay as a full-service customer of a utility, or the ESCO must provide the customer with an energy-related value-added product or service which does not dilute the value of the financial assistance program. As a part of the February 26, 2015 order, the PSC launched a staff investigation into “requirements energy service companies must satisfy when providing electric or gas *648 services in New York” in order to assess the revisions proposed in the UBP. A staff report was issued on July 28, 2015, and comments were solicited by notice dated August 12, 2015. Also in conjunction with this order, the PSC convened a collaborative to determine a mechanism by which utility low income customers could be identified, and “to define energy-related value-added products and services that must be provided to assistance program participants to qualify for exemption from the price guarantee.”[8] The collaborative report — Report of the Collaborative Regarding Protections for Low Income Customers of Energy Services Companies — was filed on November 5, 2015. As part of the collaborative, consumer advocates (the City of New York, Utility Intervention Unit of the New York State Department of State, Public Utility Law Project, and the American Association of Retired Persons) asserted that because of the difficulty identifying those low income customers because of confidentiality requirements, and the lack of quantifiable and identifiable energy-related value-added products or savings, the protections being offered for low income customers should be made available across the board to all residential customers.[9] The report was then issued with notice seeking comments on December 1, 2015 — with the Secretary to the Commission extending the comment deadlines for initial and reply comments to January 29, 2016 and February 11, 2016. During the collaborative and during the comment period, petitioners New York State Energy Marketers Coalition (NYSEMC), RESA, and NEMA opposed expansion of the protections discussed in the collaborative report to any customers beyond low income customers. It is clear that the Commission adopted the alternative approach advocated by consumer groups, citing the noncompetitive nature of the retail market, consumer complaints and marketing abuses, when it issued the reset order.
When the issue before the court concerns the exercise of discretion by an administrative agency, it “cannot interfere un *649 less there is no rational basis for the exercise of discretion or the action complained of is ‘arbitrary and capricious’ ” (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). Here, the court is also mindful when reviewing decisions of the Commission that “[a]dministrative agencies are endowed by experience with greater expertise” (Matter of Estrella v Bradford, 146 Misc 2d 48, 52 [Sup Ct, Albany County 1989]) and on issues of fact and policy it is appropriate to defer to the agency (Matter of New York State Elec. & Gas Corp. v Public Serv. Commn. of State of N.Y., 194 Misc 2d 467, 470 [Sup Ct, Albany County 2002]) and “whose judgment in such matters will be set aside only if it can be shown that a rational basis and reasonable support in the record are lacking” (Matter of New York Tel. Co. v Public Serv. Commn., 98 AD2d 535, 538 [3d Dept 1984]). Stated differently, PSC’s determinations are entitled to substantial deference and must be affirmed unless they lack “any reasonable support in the record for the action taken” (Matter of Campo Corp. v Feinberg, 279 App Div 302, 307 [3d Dept 1952]). “[A] court, in dealing with a determination . . . which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency” (Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 16 NY3d 360, 368 [2011], quoting Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 758 [1991]).[10] “[A]n agency’s order must be upheld, if at all, ‘on the same basis articulated in the order by the agency itself ” (FPC v Texaco Inc., 417 US 380, 397 [1974]) and not by the agency’s post order actions.
As an initial matter, the court finds that it is counterin-tuitive to claim that the PSC lacks jurisdiction over the retail energy market. To say that once it was established by the PSC, with a set of guidelines for its regulation and connectivity to public utilities — the UBP which allows the Commission to oversee virtually every aspect of the market, from eligibility, to marketing and contracts, and policing abuses as they affect its customers — that the PSC cannot regulate these entities with *650 consumer pricing requirements surely defies logic. “It is the duty of the Commission to prevent the imposition upon the public of unfair rates, and the creation of a rate base which is not justified” (Matter of New York State Elec. & Gas Corp. v Public Serv. Commn. of State of N.Y., 245 App Div 131, 134 [3d Dept 1935]). Public Service Law § 53 clearly provides that article 2 of the Public Service Law applies to “any entity that, in any manner, sells or facilitates the sale or furnishing of gas or electricity to residential customers.”
Nor is the characterization by petitioners, that their “participation” with the PSC in the promulgation of the UBP was “voluntary,” correct. In 1999, the Uniform Business Practices Act was enacted to regulate and standardize procedures by which ESCOs and public utility providers would operate, and by which ESCOs would pay utility services, initiate service and terminate service, provide procedures for switching between services, create a dispute resolution process, and ensure credit worthiness of ESCOs, among other things. Compliance with all the UBP guidelines is mandatory, not voluntary. The PSC may have initially excluded the retail energy market from the requirements of article 2 for purposes of application of HEFPA, but in 2002 the legislature acted to require ESCOs’ compliance with the same.
Clearly, the Public Service Commission has the authority to establish public utility rates, in fact, it has been “recognized as ‘the very broadest of powers’ ” (Matter of Kessel v Public Serv. Commn. of State of N.Y., 136 AD2d 86, 92 [3d Dept 1988]; Public Service Law § 66 [12] [f]). The Public Service Law is replete with other references to this exact authority. Public Service Law § 5 refers to the Commission’s broad statutory grant of authority over the sale of natural gas and electricity; Public Service Law, article 4, § 65.1 provides in pertinent part that “[a] 11 charges made or demanded by any such gas corporation, electric corporation or municipality for gas, electricity or any service rendered or to be rendered, shall be just and reasonable and not more than allowed by law or by order of the commission.”
General Business Law § 349-d (11) and (12) were enacted in 2010 and preserve the PSC’s authority over ESCO eligibility and marketing practices. Courts have upheld PSC decisions with respect to the operation of competitive markets in setting rates (Matter of City of New York v Public Serv. Commn. of State of N.Y., 17 AD2d 581 [3d Dept 1963]; Matter of Keyspan *651 Energy Servs. v Public Serv. Commn. of State of N.Y., 295 AD2d 859 [3d Dept 2002]).
Further, the court needs only to look to the purpose of the unbundling of the utility market to find the PSC’s authority over the same — first, to increase market competition with the intention that the same would drive utility rates lower; and second, the development of value-added energy-related products, not the least of which were those products that would entail utilization of energy conservation techniques. Public Service Law § 5 encapsulizes the legislative intent with respect to energy conservation directing the PSC to “encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs ... for the performance of their public service responsibilities with economy, efficiency, and care for . . . the conservation of natural resources” (Matter of Multiple Intervenors v Public Serv. Commn. of State of N.Y., 166 AD2d 140, 143 [3d Dept 1991]).
In addition to finding that the PSC has jurisdiction over rates charged by retail energy companies, the court finds that the reset order must be vacated for two reasons. First and foremost, the petitioners were simply denied their procedural due process rights. Albeit there is no specific statutory provision requiring the PSC give a retail energy provider notice in any particular manner (Matter of Keyspan Energy Servs. v Public Serv. Commn. of State of N.Y., 295 AD2d 859 [2002]), nor is a hearing required, as a present determination of future policy which may affect rates is not within the contemplation of a statute requiring a hearing (Matter of Burstein v Public Serv. Commn. of State of N.Y., 97 AD2d 900, 901-902 [3d Dept 1983]), procedural due process in the context of an agency determination is applicable — meaning that the PSC must provide an opportunity to be heard in a meaningful manner and at a meaningful time (Matter of Kaur v New York State Urban Dev. Corp., 15 NY3d 235, 260 [2010]). All said, petitioners are entitled to notice of procedures “tailored, in light of the decision to be made, to ‘the capacities and circumstances of those who are to be heard,’ to insure that they are given a meaningful opportunity to present their case” (Mathews v Eldridge, 424 US 319, 349 [1976] [citation omitted]) — which on careful review of the extensive submissions by the parties (in excess of 5,500 pages), was never afforded to the petitioners.
Although the PSC identifies a State Administrative Procedure Act notice dated August 12, 2015 as the notice for com- *652 merits which resulted in the reset order,[11] the notice itself actually concerns proposed amendments to the UBP, amendments which “set forth requirements ESCOs must satisfy when providing electric or gas services in New York State.” Reading the relevant staff report (July 28, 2015), the proposed changes involve faster switching time and numerous other eligibility criteria including expertise, application fees, inactive ESCOs, standard contracts, material complaints, cure periods, brokers, and the dispute resolution process. The July 28, 2015 staff report does not include any mention of eliminating energy-related value-added products or á recommendation that the retail energy providers be required to provide a price guarantee, nor (after the court’s review of all of the comments) do any of the comments received by the PSC in connection in the August 12, 2015 notice. The court notes that while PULP recommended at that time that the role of the retail energy market should be curtailed until such time as the PSC did a full study of consumer complaints and abuse by ESCOs, it did not recommend that ESCOs be charged with guaranteeing the same price as full-service utilities. It advocated greater consumer protections and better enforcement and oversight by the PSC. Certainly none of the comments received as a part of the August 12, 2015 notice would give petitioners any inkling of the type of change which resulted from the reset order. Petitioners simply were made aware of what would be required by the reset order in that August 12, 2015 notice.
Also considered by the PSC in arriving at the reset order were the results of the Report of the Collaborative Regarding Protections for Low Income Customers of Energy Services Companies. The title of the collaborative identifies what a reasonable person would anticipate the focus group to be, and that is low income assistance customers. The court specifically notes that the staff collaborative was conducted over a period of a year, with the ESCO petitioners fully participating in its process. There was much discussion of the consequences of extending the protections which were mandated for low income assistance customers to all residential customers. Particularly, the issue was extensively briefed by petitioners prior to the issuance of the reset order. RESA submitted an extensive response to the PULP proposal in a letter dated November 2, 2015, and acknowledged the proposal in a letter dated January *653 29, 2016, which includes the finding that “[i]t is reasonable and rational to limit the standards adopted in this proceeding to APP customers and not expand them to include all residential customers” (letter to Commissioner Burgess from Usher Fogel, counsel, dated Jan. 29, 20Í6).[12] NEMA also commented on the proposal, calling it outside the scope of the collaborative and requesting it be rejected (Nov. 2, 2015). NYSEMC commented that such action would “essentially negate retail choice in New York” and the consumer advocates’ suggestion is unrelated to the issue of protections for low income consumers. These are just a few samples of the responses by petitioners to the consumer advocates’ proposals. The responses, however, were clearly not tailored with the expectation that the consumer advocates’ suggestion was part of the scope of the collaborative, and there is repeated observation by both the PSC and participants in the collaborative that the proposal was “outside the scope of this proceeding.”
The collaborative originated from two provisions of the February 25, 2014 order which directed ESCOs to obtain consent from the utility to provide information about low income assistance customers and then provide those customers with products that guarantee savings over what the customer would otherwise pay to the utility. To comply, the ESCO must be able to “compare the actual customer bills to what the customer would have been billed at the utility’s rates and, on at least an annual-basis, provide any required refund as a credit on the customer’s bill.” The order also provided that in the alternative, the ESCO must provide the customers “energy-related value-added services that are designed to reduce the customer’s overall energy bill” and the directive further ordered that if an ESCO could or would not do this, it could choose not to service low income assistance customers. The other provision of the order directed further investigation into “energy related value added services.” While the February 2014 order discussed the PSC staffs extensive investigation into “realignment of the regulatory framework” due to “major weaknesses in the residential and small non-retail residential markets due to lack of accurate, transparent and useful information and marketing behavior that creates and too often relies on *654 consumer confusion,”[13] nowhere in the document is there any suggestion that energy-related value-added services would be totally eliminated — as they were in the reset order — or that all residential customers would be included in the low income assistance rate guarantee. As such, petitioners were not given sufficient notice that the collaborative would lead to the reset order.
The second reason the reset order must be vacated is that it bears little rational relationship to the February 2014 rehearing proceedings, the comments on the staff report of July 28, 2015, or the November 5, 2015 Report of the Collaborative Regarding Protections for Low Income Customers of Energy Services. The reset order, in its introduction, proposes to immediately take steps to remedy “unfair business practices,” none of which are addressed in the collaborative report, and which were only briefly described in the February 25, 2014 order. Consumer complaints were also addressed, again briefly, in the 2014 order, and the 2014 order and accompanying changes to the UBP set forth numerous consumer protections which would be enacted in order to improve customer knowledge and satisfaction. Given the very sweeping and comprehensive changes to the UBP, meant to improve the retail energy market, and the recommendation by the majority of commentators that further study be given to energy-related value-added services, the reset order appears to be irrational, arbitrary and capricious. Also arbitrary and capricious is the “immediate transition” — the 10-day period by which the reset order was to be implemented. Here, the court agrees with the assessment made by all the petitioners: the implementation of the reset order in a time span of 10 days is not only unduly burdensome, it is impossible.
The respondent’s activities immediately following the issuance of the reset order are a tacit admission that the notice given to petitioners was clearly inadequate. Immediately following the issuance of the order, three guidance documents were issued by PSC staff explaining compliance. The order itself provided for comments for a 60-day period following its issuance. A conference was also held by phone between PSC staff and the ESCOs. By far the biggest admission, however, was the issuance of a notice on April 6, 2016 — which should *655 have been issued prior to the reset order — that comments would be accepted on the following proposed action: “The commission is considering imposing limitations upon energy service company eligibility to provide service and prices for commodity-only services, and the range of value added services with respect to residential and non-residential services.” The notice is entitled “Resetting Retail Markets for ESCO Mass Market Customers.” On the court’s reading of the notice, it invites comments on all of the provisions set forth in the reset order. Now, more than a bit late, the notice also attempts to position respondent poised to enact a similar rule, if or when it winds up on the losing side of this article 78 proceeding. However viewed, it all speaks volumes of petitioners being stripped of any meaningful opportunity to participate in the promulgation of the reset order.
Respondent argues that the petitioners are precluded from attacking its February 2014 determination as to the “unworkability of the retail energy market,” and it is therefore a rational basis for the 2016 reset order. The court disagrees, mindful that the Commission’s order must be upheld, if at all, on the same basis articulated in the order by the agency itself CFPC, 417 US 380), judging “the propriety of [the] action solely [on] the grounds invoked by [that] agency” (Matter of National Fuel Gas Distrib. Corp, 16 NY3d at 368). The PSC determination to base the reset order on the unworkability of the market and consumer complaints bares no rational relationship to the February 25, 2014 order or the collaborative on low income customers, or to the many comments made with respect to the UBP, which proposed significant changes which would strengthen consumer oversight and consumer protections. Reviewing the record of the 2014 proceedings and the 2015 proceedings, including the collaborative report and the comments on the report, what is abundantly clear is that the reset order is the direct result of the Commission’s inability to identify who are low income assistance customers, and the inability to identify and quantify what was an energy-related value-added service or product — a rationale that was not articulated by the PSC. There was little concrete discussion about the “unworkability” of the market, and only a cursory discussion of consumer complaints. For their part, petitioners reasonably believed they were addressing consumer complaints, in part, by the comments and discussion concerning enhancements and modifications to the UBP. For example, the Febru *656 ary 25, 2014 order proposed price transparency, with the requirement that all utilities provide online bill calculators that would enable ESCO customers to compare their bill with that charged by the utility for the same energy in the current bill and the preceding 12 months. The court also agrees with petitioners that the reset order is arbitrary and irrational in that it imposes the unexplained and harsh 10-day implementation period for the order, which amounts to a major restructuring of the retail energy market — or even its collapse. The court is perplexed that implementation would be so immediate, when by the PSC’s own admission so many questions remain. Here, the court notes that the order provides for a 60-day period immediately following the order which the PSC explains is to answer, among others, the question “Whether prospective ESCO sales to mass market customers, including renewal of expiring contracts, should be limited to products that include ‘guaranteed savings’ or a defined energy-related value added service.”
For the reasons set forth above, the court finds that provisions 1 through 3 of the reset order dated February 23, 2016 must be vacated.
Accordingly, it is ordered, that the article 78 petitions are granted to the extent that provisions 1 through 3 of the reset order are vacated; and it is further ordered, that the matter is remitted to the PSC for further proceedings, including notice specific to the directives of the February 23, 2016 reset order, that is, the imposition of a rate for commodity only retail energy companies which guarantees a customer a rate equal to that charged by a full-service utility — together with the notice already given in the April 6, 2016 notice “Resetting Retail Markets for ESCO Mass Market Customers”; and it is further ordered, that respondent’s request for an undertaking is denied; and it is further, ordered, that the amici curiae motions for leave to appear and argue are denied.

. The matters were not consolidated, however, the arguments set forth by each petitioner are substantially the same, and all three petitions relate to one transaction, the implementation of the reset order. Where the petitions differ, if any, the same will be noted in this decision and order.

. Extensive oral argument was had prior to the granting of the stay.

. New York regulation text, May 4, 2016, petitions for rehearing of the order resetting retail energy markets and establishing further process.

. Language is found on page two of the 23-page order. Petitioners disagree on what the order requires: Retail Energy Supply Association (RESA) petitioners, through the affidavits of Michael Scott White, Esq., argue there must be “a guaranteed] savings over the price paid by utility customers,” and Family Emergency petitioners interpret it as “the enrollment contract guarantees that the customer will pay not more than were the customer a full-serve customer of the utility.” The language of the order is itself inconsistent, but the court interprets it to mean the latter. See also guidance document, dated March 3, 2016, “customer will pay no more than if customer were a full service customer of a utility.”

. The court was unable to locate any of the actual petitions for a rehearing in the administrative record provided by the PSC, precluding review of this argument.

. Gas markets underwent this conversion in the mid-1980s.

. The New York Attorney General voiced concerns that the “publically supported assistance funds are pocketed by ESCOs, and they frequently charge customers a premium above the utilities’ rates that greatly exceeds the subsidy.” (June 16, 2014 reply of Attorney General Eric T. Schneiderman in response to petitions for rehearing, reconsideration and clarification; Proceeding on Motion of the Commn. to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Mkts. in N.Y. State, NY PSC Case No. 12-M-0476 [Feb. 25, 2014].)

. Proceeding on Motion of the Commn. to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Mkts. in N.Y. State, NY PSC Case No. 12-M-0476 (Feb. 25, 2014) (order taking actions to improve the residential and small nonresidential retail access markets).

. PULP and Public Advocate for New York concluded that ESCOs are simply not able to offer products that guarantee savings, and privacy issues made it unlikely that low income customers could be readily identifiable and consumer protections made this data sharing improbable. Further, changes in utility databases and other costs of maintaining a verification system would need to be transferred to the ratepayer.

. The motions for leave to appear and argue as amici curiae in this proceeding seek to address the issue of consumer complaints. In that regard, however, all the applications are supported by only attorney affidavits, which are not evidentiary (Bronson v Algonquin Lodge Assn., 295 AD2d 681, 681 [3d Dept 2002]).

. Identified by respondent as SAPA No. 15-M-0127SP1, it is not included in the administrative record.

. The Fogel letter on behalf of RESA clearly reflects that such expansion is a suggestion which goes beyond the original purpose of the collaborative.

. Proceeding on Motion of the Commn. to Assess Certain Aspects of the Residential and Small Non-residential Retail Energy Mkts. in N.Y. State, NY PSC Case No. 12-M-0476 (Feb. 25, 2014).