[685 NYS2d 74]

In the MATTER OF TOWN OF PLEASANT VALLEY, Respondent, v
NEW YORK STATE BOARD OF REAL PROPERTY SERVICES, Ap-
pellant.

Second Department, January 19, 1999

### APPEARANCES OF COUNSEL

*Eliot L. Spitzer, Attorney-General,* New York City (*M. Kevin Coffey* of counsel), for appellant.

*Quatararo & Quatararo,* Poughkeepsie (*Richard Olson* of counsel), and *Segel, Goldman & Mazzotta,* Albany (*Paul J. Goldman* of counsel), for respondent. (One brief filed.)

### OPINION OF THE COURT

FRIEDMANN, J.

On this appeal we are asked to determine whether the quantity and character of discovery permitted in a proceeding pursuant to CPLR article 78 to review the equalization rates imposed on a municipality by the State differ from the discovery allowed in a tax certiorari proceeding pursuant to RPTL article 7. We conclude that the standards for discovery in a CPLR article 78 proceeding commenced pursuant to RPTL 1218 to review municipal equalization rates are broader than those permitted in RPTL article 7 tax certiorari challenges to real property assessments.

#### BACKGROUND

In these consolidated CPLR article 78 proceedings the Town of Pleasant Valley (hereinafter the Town) seeks to review the

determination of the New York State Board of Real Property Services (hereinafter the Board) finally establishing the Town's 1993 and 1994 State equalization rates on the grounds that the Board's methods of arriving at these equalization rates were arbitrary and capricious, unsupported by substantial evidence, in violation of lawful procedures, and an abuse of discretion.

**Proceedings Before the Board**

  **(a) The setting of the Town's 1993 equalization rate:**

In January 1993, the Town had "committed to proceed with [a] full revaluation of [its] assessment rolls", in the hope of bringing the assessed values of the properties on its assessment rolls to 100% of full value, having allegedly been assured by the Board that such a "full value revaluation" would result in a reduction in its real property taxes.

On or about November 11, 1993, the Board issued to the Town a notice establishing a tentative State equalization rate of 60.39% for the 1993 assessment roll. Although the Board was required under RPTL 1208 to schedule a hearing, according to the Board's own rules, attendance at such hearings is optional (see, 9 NYCRR 186-15.5). Pursuant to RPTL 1206, if a Town "proposes to complain at the hearing" it must file a "written complaint". On November 29, 1993, the Town filed its complaint with the Board, challenging the tentative rate determination. The hearing was held on December 13, 1993; however, the Town did not attend. On January 20, 1994, following a Board-authorized adjournment of the Town's time to submit documentation in support of its complaint, the Town submitted written objections to the appraised value of 25 parcels on 25 "EA-5022" forms, accompanied by extensive supporting documentation.

Thereafter, the Board's Complaint Review Panel reviewed the complaint and assigned the Town's objections to the Property Valuation Bureau for further investigation. On May 7, 1994, the Property Valuation Bureau issued a report recommending reductions in the values of 16 sample parcels. The Complaint Review Panel accepted these recommendations and proposed a final State equalization rate for 1993 of 62.83%. The proposal was reviewed by counsel to the Board, and the Board formally adopted the amended rate at its June 1, 1994 meeting.

Thereafter, the Board determined that the Town of Pleasant Valley was entitled to a "special equalization rate" in order to "provide[ ] a more accurate measurement of the level of assessment on the current assessment roll", and to effectuate "a more

equitable apportionment of taxes and computation of exemptions and assessments on that assessment roll". On August 9, 1994, the Division notified the Town that its special equalization rate was 86.62%.

On September 28, 1994, the Town commenced the first proceeding pursuant to CPLR article 78 to review the 1993 final equalization rate alleging, *inter alia,* that the methodology employed by the Board failed to take into account the impact on the Town's real property values caused by a downsizing of International Business Machines (hereinafter IBM), which resulted in a loss of some 10,000-15,000 jobs from the local economy, the development of the Iroquois natural gas pipeline which ran through the Town, and the reclassification of considerable Town property as wetlands by State and Federal authorities. These flaws in the Board's methodology were compounded by its "significant and serious over valuation" of certain mobile home, commercial and income properties, as well as by "a wide variety of inventory errors" and a failure "to adhere to its own random sampling techniques by selecting a disproportionately large number of samples as its base for the survey".

### (b) The setting of the Town's 1994 equalization rate:

According to the Town, the Board's methodology in setting the 1994 equalization rate was similarly flawed. On January 31, 1995, the Board notified the Town that its tentative equalization rate for 1994 was 92.21%. On February 6, 1995, the Town filed a complaint. The Town objected to the appraised values of 48 sample parcels out of the 66 parcels used to calculate the tentative State equalization rate. The Town attended a meeting with the Board's staff during the "informal" stage of administrative review, but it did not attend the hearing which occurred on March 6, 1995.

The Town's new complaint was reviewed by the Complaint Review Panel which made assignments to "Regional Operations" for the review of all 48 parcels challenged by the Town. In a July 25, 1995 report, "Regional Operations" recommended no reduction in the appraised value of 27 parcels, but did advise a reduction in the appraised value of the remaining 21 sample parcels challenged by the Town. These recommendations and the underlying material were reviewed by counsel for the Board, who directed the preparation of proposed "findings and determinations". The Board reviewed and adopted the proposed "findings and determinations", establishing a final equalization rate of 95.92% for the Town's 1994 assessment roll at its August 9, 1995 meeting.

On December 4, 1995, the Town commenced its second CPLR article 78 proceeding. In the second petition the Town alleged that the Board had not conducted a "full market value survey", that the Board's "adaptive estimation procedure" was a flawed methodology, and that it was arbitrary and capricious for the Board to establish a "special equalization rate" of 86.80%, even though the Town had performed a "full value revaluation" of the 1994 assessment rolls assessing subject properties at 100% of full value. The Town also reasserted certain claims raised in the first petition, i.e., that the Board failed to take into account the declining real estate market in the Town, as well as the impact upon its property values of massive layoffs by IBM and resulting tax and foreclosure sales.

The Town strictly adhered to the guidelines for obtaining administrative review which had been set out in a pamphlet mailed to it by the Board along with its tentative equalization rates. This pamphlet obliged the Town to fill out one form (form EA-5022) per parcel for which the assessment was being challenged, and to confine its objections thereon, as well as in any supplemental documentation, to errors in data and/or violations of rules. The administrative review procedure does not provide for a challenge to the underlying methodology employed by the Board. Indeed, the Board's instruction booklet expressly states: "Questions concerning procedures and methodology * * * will not be reviewed". As the pamphlet itself makes clear, challenges to methodology must await the issuance of a "final" equalization rate, whereupon a municipality is empowered by RPTL 1218 to seek judicial review pursuant to CPLR article 78. Accordingly, the Town had to await the commencement of its proceedings pursuant to CPLR article 78 to raise its contention that the Board had failed to apply a valid methodology and/or proper statistical procedures in assessing the sample parcels and therefore had issued improper equalization rates for the Town.

**The Instant Discovery Motion**

After the Supreme Court had *sua sponte* consolidated the Town's two CPLR article 78 proceedings in April 1996, the Town moved, pursuant to CPLR 408, 3124 and 7804, to compel the Board to provide certain discovery. While the Board agreed to supply some of the requested materials, it objected to the production of "turnaround" documents, i.e., the worksheets used by the State's appraisers as they decide which comparable sales properties to use and which to discard in determining survey parcel valuations. The Board cross-moved, *inter alia,* for a protective order relative to these records, as well as

with respect to the Town's demand for the names and qualifications of the personnel who had performed the assessments used to determine the challenged equalization rates.

It was the Town's position that because the turnaround documents formed the underlying basis for the Board's calculations of property values, such documents were "relevant and necessary" to the Town's, and the court's, ability to ascertain whether the Board's methodology was rational. The Town argued that the only appraisals supplied by the Board, documents known as Property Inventory and Valuation Reports (hereinafter PIVR), were single-sheet, conclusory records that neither reflected what, if any, adjustments had been made, nor referenced any supporting evidence. According to the Town, a review of the turnaround documents was essential to a determination of the rationality of the valuation system employed by the Board.

The Town also contended that it was entitled to the names and qualifications of the Board's appraisers in order to assess whether the Board had adhered to its own procedures by having properly certified personnel review the subject valuation model and the resulting appraisal information. The Town argued that there was no evidence that there had been any supervisory or independent review of the appraisers' work, which should have been performed according to section 9.5 of the International Association of Assessing Officers' "Standard on Ratio Studies". Moreover, the Town's own assessments of certain of its properties were based upon the calculations of certain "recognized experts", and it could not tell from the disclosure supplied by the Board whether the Board's failure to accept these assessments was due to a mere oversight or was based upon the Board's reliance on competing experts' opinions.

The Board countered that the Town was entitled to *only* the PIVRs. According to the Board, its appraisers frequently made handwritten notes on the pre-PIVR turnaround sheets, representing their personal observations as to which comparables to use and which to reject. Disclosure of such private cogitations would have a chilling effect on the Board's appraisers, it argued, because they would be inhibited in the future from making written records of their mental processes, which in turn would hinder the Board's ability to review and verify its appraisers' work. The Board further submitted that the names and qualifications of its appraisers constituted "irrelevant and privileged" information. By order dated December 16, 1996, the Supreme Court directed the Board to afford the

petitioner's attorney "access to the underlying appraisals, reports and turnaround documents" for the tax years 1991 through 1994.

The Board has appealed.

ANALYSIS

The Board argues that the instant matter is indistinguishable from a proceeding commenced pursuant to RPTL article 7 to challenge a tax assessment levied by a locality on real property within its borders. A proceeding pursuant to RPTL article 7 is usually brought by the private owner of the individual parcel being assessed. The property assessments challenged by way of an RPTL article 7 proceeding have been arrived at by means of an adjudicatory administrative process, and the courts have declined to grant voluminous discovery relative to the assessors' methodology. For example, the scope of discovery in an RPTL article 7 proceeding has been limited to whether a fixed equalization rate has been promulgated for the town in which the property is located; if so, what that equalization rate is; and whether said rate has been applied uniformly to all of the properties within the Town (see, e.g., *Blooming Grove Props. v Board of Assessors*, 34 AD2d 953; see also, *Ed Guth Realty v Gingold*, 34 NY2d 440; RPTL 720). In addition to shielding the taxing authorities from having to endlessly litigate private property assessments with individual landowners throughout the State, such limitations on discovery in proceedings pursuant to RPTL article 7 are further justified because "whether or not[,] a specific assessment is assailable is tested not by the formula used by the assessors but [by] the fairness and reasonableness of their conclusion" (*Blooming Grove Props. v Board of Assessors, supra,* at 953; see also, *Matter of Limerick v Fitzgerald,* 29 Misc 2d 185).

Put somewhat differently, a proceeding under RPTL article 7 is in the nature of "a trial *de novo* to decide whether the total assessment of the property is correct and if it is not[,] to correct it" (*Matter of Katz Buffalo Realty v Anderson,* 25 AD2d 809; see also, *Consolidated Edison Co. v State Bd. of Equalization & Assessment,* 112 Misc 2d 422, 423). Under RPTL article 7, "the concern is with the assessment imposed and not the manner in which the assessment was determined. What the assessor did or failed to do is irrelevant" (*Consolidated Edison Co. v State Bd. of Equalization & Assessment, supra,* at 423; see also, *Matter of National Fuel Gas Distrib. Corp. v State Bd. of Equalization & Assessment,* 86 AD2d 707). If the petitioner

fails to establish that the challenged individual assessment was too high, " 'any [methodological] error of the Assessors is without import' " (*Matter of Katz Buffalo Realty v Anderson, supra,* at 810).

In a proceeding pursuant to RPTL article 7 the court's review is limited since assessors perform a judicial function and the administrative proceeding is itself adjudicatory in character. In contrast, the Board's setting and subsequent review of a municipality's tentative equalization rate is only quasi-judicial. The final equalization rate must therefore have been arrived at by means of a procedure that was not arbitrary or unreasonable (*see, e.g., Ed Guth Realty v Gingold, supra; Matter of Town of Smithtown v Moore,* 11 NY2d 238, 247; *Matter of County of Nassau v State Bd. of Equalization & Assessment,* 80 AD2d 9, 11; 860 *Executive Towers v Board of Assessors,* 53 AD2d 463, 474, *affd sub nom. Matter of Pellaton Apts. v Board of Assessors,* 43 NY2d 769). Because of the onerous burden on the Town of proving that the Board's establishment of the Town's equalization rate is irrational and/or not supported by substantial evidence (*see, e.g., Matter of Town of Greenburgh v New York State Bd. of Equalization & Assessment,* 226 AD2d 546), it would be unconscionably harsh to deny the Town's request for disclosure of material without which it stands little chance of meeting this burden.

Under RPTL 1218, the Legislature provided that once a final determination has been issued—at the conclusion of a quite limited administrative process which, although denominated a review, is really a negotiation between the municipality and the Board—the Town may challenge the entire rate-setting process by means of a proceeding pursuant to CPLR article 78 (9 NYCRR subpart 186-15; *see, e.g., Consolidated Edison Co. v State Bd. of Equalization & Assessment, supra,* at 424, n 4; *see also, 860 Executive Towers v Board of Assessors, supra,* at 473-474). Under CPLR article 78, a petitioner is not entitled to discovery as of right, but must seek leave of court pursuant to CPLR 408. Because discovery tends to prolong a case, and is therefore inconsistent with the summary nature of a special proceeding, discovery is granted only where it is demonstrated that there is need for such relief (*see, e.g., Plaza Operating Partners v IRM [U.S.A.],* 143 Misc 2d 22, 24). When leave of court is given, discovery takes place pursuant to CPLR 3101 (a), which provides generally that "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action". The Court of Appeals has ruled

that " 'material and necessary' " should be "interpreted liberally to require disclosure, upon request, of any facts bearing on the controversy which will assist preparation for trial by sharpening the issues and reducing delay and prolixity. The test is one of usefulness and reason" (*Allen v Crowell-Collier Publ. Co.,* 21 NY2d 403, 406).

Generally, the trial court has broad discretion in granting or denying disclosure (*see, e.g., Matter of Pyramid Mgt. Group v Board of Assessors,* 243 AD2d 876; *Matter of Xerox Corp. v Duminuco* [appeal No. 1], 216 AD2d 950), although it must balance the needs of the party seeking discovery against such opposing interests as expedition and confidentiality (*see,* 3 Weinstein-Korn-Miller, NY Civ Prac ¶ 408.01). The Board has not demonstrated that providing the requested discovery would be prejudicial or unduly burdensome, would violate confidentiality, or would unduly delay the case (*cf., 860 Executive Towers v Board of Assessors, supra*). In the absence of such contravening interests, any discovery that is relevant to the controversy at issue qualifies as material and necessary and should be allowed (*see, 860 Executive Towers v Board of Assessors, supra*).

At issue here is not the assessment imposed, but rather the manner in which the assessment was arrived at. Accordingly, "[w]hat the assessor did or failed to do" is centrally relevant to a determination of whether the establishment of the equalization rate was rational and supported by substantial evidence (*see, Matter of Town of Mamakating v New York State Bd. of Real Prop. Servs.,* 246 AD2d 844; *Matter of Incorporated Vil. of Lynbrook v New York State Bd. of Equalization & Assessment,* 209 AD2d 765, 766). "Inasmuch as the rate is premised upon [the Board's] calculation of the market value of property in the jurisdiction, which, in turn, stems from its appraisal of a sample of purportedly representative properties, the methodology used for selecting the parcels to be appraised (including the reasons for rejecting certain properties, and the means of arriving at substitutes), and performing the appraisals, is at the heart of the rate-setting process" (*Matter of Town of Mamakating v New York State Bd. of Real Prop. Servs., supra,* at 845; *see also, Matter of City of Syracuse v State Bd. of Equalization & Assessment,* 101 AD2d 653, 654, *affd* 64 NY2d 894). Accordingly, the Supreme Court did not abuse its discretion in directing the Board to give the Town access to the requested materials.

The Board's belief that *Matter of City of Syracuse v State Bd. of Equalization & Assessment (supra)* supports its contention

that turnaround documents are not discoverable is misplaced. In *Matter of City of Syracuse,* the Appellate Division, Third Department, found that the Board had made full disclosure of its methodologies, calculations, statistics, and the properties it had used in arriving at the challenged equalization rate. In concluding that the Board had established that its method was "an adequate" if not necessarily *the most* accurate one (*Matter of City of Syracuse v State Bd. of Equalization & Assessment, supra,* at 654; *see also, Matter of City of Syracuse v State Bd. of Equalization & Assessment,* 108 AD2d 973), the Appellate Division, Third Department, expressly stated: "[T]o support its determination [of the equalization rate], SBEA must provide 'detailed explanations of both the methodology used in calculating equalization rates in general and the specific property value figures utilized in determining the rates' * * * which they have done in the present case" (*Matter of City of Syracuse v State Bd. of Equalization & Assessment, supra,* at 654, quoting *Matter of County of Nassau v State Bd. of Equalization & Assessment,* 91 AD2d 53, 55). It is merely this level of disclosure that the Town is requesting here.

However, we conclude that the Board may redact, as "interagency materials" exempt from discovery, any handwritten notes or other expressions of subjective opinions or recommendations by its assessors that may have been jotted onto these turnaround documents (*see,* Public Officers Law § 87 [2] [g]; *Matter of Town of Mamakating v New York State Bd. of Real Prop. Servs., supra,* at 845-846; *Matter of Bray v Mar,* 106 AD2d 311, 313). We are further persuaded by the reasoning of the Appellate Division, Third Department, in *Matter of Town of Mamakating,* that only the qualifications, but not the names, of the Board's appraisers should be disclosed.

Accordingly, the order appealed from is modified by (1) deleting the provision thereof which, in effect, granted that branch of the petitioner's motion which was to compel the respondent to disclose the names of its personnel who performed the appraisal and substituting therefor a provision denying that branch of the motion, and (2) adding a provision thereto allowing the respondent to redact from the turnaround documents any handwritten notes or other expression of subjective opinions or recommendations by its appraisers.

RITTER, J. (Concurring in part and dissenting in part and voting to modify the order appealed from by deleting the provisions thereof granting those branches of the petitioner's motion

which were to compel the respondent to provide turnaround documents and the names of its appraisers and substituting therefor provisions denying those branches of the motion with the following opinion, in which ALTMAN, J., concurs.) Because I cannot agree that the Town has demonstrated that disclosure of the "turnaround documents", with handwritten notes redacted, is material and necessary to this proceeding, I respectfully dissent from so much of the majority's opinion as affirms that portion of the order under review. The only information not already provided to the Town that will be revealed by disclosure of the turnaround documents is which potentially comparable properties were listed by staff but not utilized by the Board in setting the final equalization rates. This information is neither material nor necessary to determine the issue at hand, to wit: whether the values established for sample properties were the result of a rational process (see, *Matter of City of Syracuse v State Bd. of Equalization & Assessment,* 101 AD2d 653, *affd* 64 NY2d 894). We need not decide whether better comparables might have been selected or more accurate values determined (see, *Matter of City of Syracuse v State Bd. of Equalization & Assessment, supra).*

Neither party supplied a specimen nor proffered a precise definition of turnaround document. The only express attempt to define a turnaround document was by the Board, which asserted: "The turn-around documents are lists of properties to be appraised together with suggested comparable properties. There are often handwritten, scribbled notes reflecting the appraiser's work as they decide which of the suggested comparables to use and which to to reject".

Comparables are properties sold in market transactions that are comparable to sample properties which are selected to be representative of all taxable properties in a municipality, and whose values are adjusted for any differences between such comparable properties and a sample parcel in order to derive a fair market value for the sample parcel (see, 9 NYCRR 186-1.14 [b] [1]; *Matter of General Elec. Co. v Town of Salina,* 69 NY2d 730). The Board's description of a turnaround document was adopted by the Town, which focused its arguments in support of disclosure of the turnaround documents by stating: "In order to determine the adequacy and rationality of the methodology employed by [the Board], the entire process, including appraisers' notes and why they employed or rejected certain sales, must be available to the Town for review". Because the majority and I agree that any handwritten notes

made by the Board's appraisers are not subject to disclosure, and because the comparables actually selected by the Board were in fact disclosed to the Town, all that remains undisclosed is a list of potential comparables not selected by the Board, which, as noted above, is not relevant to the issue at hand. Moreover, a number of the comparables not selected by the Board were relied on by the Town as part of its administrative challenges to various of the comparables used by the Board. In many instances, the Town's proffered comparables were employed by the Board to revalue sample parcels. In fact, the Town met with considerable success in its administrative challenges, obtaining increases in the equalization rate from 60.39% to 86.62% for 1993, and from 92.21% to 95.92% for 1994.

Moreover, the identity of which potential comparables were not selected by the Board may be ascertained without the discovery sought (*see, Matter of Town of Greenville v New York State Bd. of Real Prop. Servs.*, 251 AD2d 788). The Town has access to information on all market sales of property within the Town in its own assessment records and those maintained by the County Clerk. The sale of any property comparable to a sample parcel that was not employed by the Board is, by definition, a rejected comparable. This information permits the Town to challenge the adequacy and rationality of the comparables selected by the Board and the values established for sample parcels. This point was forcefully made by this Court in *860 Executive Towers v Board of Assessors* (53 AD2d 463, 473, *affd sub nom. Matter of Pellaton Apts. v Board of Assessors*, 43 NY2d 769), which, in approving the denial of disclosure of various data underlying an equalization rate, held: "In lieu of this raw data, the County was granted a list of all appraisals and sales actually used in the pertinent surveys. The County could easily have randomly selected some appraisals and sales and have either double-checked them against the information in the County Assessor's office or engaged an expert appraiser to undertake *de novo* appraisals. It could have then called any serious discrepancies to the attention of the court. Thus, the raw data denied the County did not prevent it from impeaching the State rates". The same avenues were open to the Town in this case.*

In addition, the Town made no request for the turnaround documents during the administrative proceedings. This point

---

* Although the decision in *860 Executive Towers* arose in the context of an RPTL article 7 proceeding, not, as here, in an RPTL article 12 proceeding,

was raised before the Supreme Court by the Board, which objected to the fact that the Town was raising objections to "methodology and procedure" for the first time in this CPLR article 78 proceeding and argued that it had been deprived of an opportunity to consider and respond to these objections. Thus, denial of disclosure is further supported by the doctrines of exhaustion of administrative remedies and preservation (*see, Matter of Hughes v Suffolk County Dept. of Civ. Serv.*, 74 NY2d 833; *Watergate II Apts. v Buffalo Sewer Auth.*, 46 NY2d 52; *Matter of Town of Greenville v New York State Bd. of Real Prop. Servs., supra; Matter of Town of Mount Kisco v State Bd. of Equalization & Assessment*, 101 AD2d 462, *affd* 64 NY2d 950). Indeed, the courts have emphasized the need to litigate the rationality and adequacy of State equalization rates before the Board during the administrative review process (*see, Matter of Town of Mount Kisco v State Bd. of Equalization & Assessment, supra; 860 Executive Towers v Board of Assessors, supra*). Finally, the recent decision of the Appellate Division, Third Department, in *Matter of Town of Greenville v New York State Bd. of Real Prop. Servs. (supra)* supports the conclusions herein and clarifies and provides significant insight into its prior decision in *Matter of Town of Mamakating v New York State Bd. of Real Prop. Servs.* (246 AD2d 844).

Accordingly, I would modify the order of the Supreme Court by deleting those provisions which ordered the disclosure of the turnaround documents and the names of the Board's appraisers, and would substitute therefor provisions denying such relief.

MILLER, J. P., and LUCIANO, J., concur with FRIEDMANN, J.; RITTER and ALTMAN, JJ., concur in part and dissent in part in a separate opinion by RITTER, J.

Ordered that on the Court's own motion, the appellant's notice of appeal is treated as an application for leave to appeal and leave to appeal is granted (*see,* CPLR 5701 [c]); and it is further,

Ordered that the order is modified, as a matter of discretion, by (1) deleting the provision thereof which, in effect, granted that branch of the petitioner's motion which was to compel the respondent to disclose the names of its personnel who performed the appraisal and substituting therefor a provision denying that branch of the motion, and (2) adding a provision

nothing in Justice Hopkins' opinion indicates that the quoted language was limited to RPTL article 7 proceedings.

thereto allowing the respondent to redact from the turnaround documents any handwritten notes or other expression of subjective opinions or recommendations by its appraisers; as so modified, the order is affirmed, without costs or disbursements.